UNITED STATES, Appellee

v

LAWRENCE L. MURRAY, Airman First Class,
U. S. Air Force, Appellant

15 USCMA 183, 35 CMR 155

*Major Milton E. Kosa* argued the cause for Appellant, Accused. With him on the brief was *Colonel Robert O. Rollman.*

*Major Thomas J. Connally* argued the cause for Appellee, United States. With him on the brief was *Colonel Emanuel Lewis.*

## Opinion of the Court

FERGUSON, Judge:

Tried before a general court-martial convened at Maxwell Air Force Base, Alabama, by the Commander, Air University, the accused was found not guilty of a specification of indecent assault upon a Mrs. K and another count alleging the same offense with respect to a Mrs. S, but, regarding the latter, guilty of the lesser included offense of committing an indecent act upon S's person, all in violation of Uniform Code of Military Justice, Article 134, 10 USC § 934. He was sentenced to bad-conduct discharge, forfeiture of $46.00 per month for three months, confinement at hard labor for three months, and reduction to the grade of Airman Basic. Intermediate appellate authorities affirmed, and we granted accused's petition for review upon the specified issue:

"THE ACCUSED WAS PREJUDICED BY RECEIPT INTO EVIDENCE OF AN ALLEGED 'APOLOGY' OF THE ACCUSED WHICH WOULD BE CONSTRUED BY MEMBERS OF THE COURT-MARTIAL AS AN ADMISSION OF GUILT."

During the early part of January 1964, both Mrs. K and Mrs. S were patients in a United States Air Force Hospital. Accused was assigned administrative duties in the hospital which did not require him physically to touch or examine any patient. Both Mrs. S and Mrs. K were hospitalized in connection with childbirth.

On January 4, 1964, accused approached Mrs. S's bed and "said he wanted to get my record or some papers straightened out, and he started to ask me questions." As Mrs. S answered the questions, accused recorded her re-

plies on a form. Thereafter, he drew curtains partially around the bed and declared that he had to count Mrs. S's stitches. He then pulled the covers down and, purporting to count, touched Mrs. S indecently with a tongue depressor. Mrs. S permitted him to perform this act only because she thought he was authorized to do so. Afterwards, she consulted a nurse and reported the matter.

Mrs. K testified that, on January 1, 1964, while a patient in the maternity ward, accused approached her bed apparently in order to obtain information about her background. After completing this task and recording the answers, he also sought to check her stitches. As in the case of Mrs. S, accused touched Mrs. K's body indecently in several places with an instrument which "looked something like a 'remometer.'" Mrs. K would not have agreed to such acts on the part of the accused unless she had believed them to be part of his official duties. Subsequently, she observed his similar conduct with Mrs. S, and spoke to her about it. Mrs. S then consulted the nurse.

When Airman Murray approached Mrs. K, she was "sleepy, groggy and drowsy" as she had given birth to a child only one or two hours previously. However, she was conscious during the incident, and thought herself to be normal. The defense adduced evidence which indicated that Mrs. K, prior to the delivery of her child, had been administered Demerol and Largon, drugs which, in the opinion of an expert witness, would cause the patient to be susceptible "to having hallucinations, fantasy dreams, or any form of make-

believe to any degree [for] a few hours after she had given birth." While under the influence of such drugs, it was not rare for a woman mistakenly to imagine that someone came to her bedside, talked with her, and touched her person. In the expert's opinion, such patients' reports were generally unreliable.

A number of witnesses attested to the accused's efficiency, good moral character, and reputation for decency in his community.

The matter which gives rise to the issue before us occurred during the testimony of both Mrs. S and Mrs. K. Over objection by defense counsel, Mrs. S was permitted to answer an inquiry by trial counsel as follows:

"A. A nurse working on the ward came to me and said she had a message from Airman Murray and she said he said he apologized and he was sorry for what he had done."

Following this, Mrs. K testified:

"A. I was laying across the bed. A nurse came in and said I had a visitor. I put on my robe and walked down the corridor. This lady was there. She said Airman Murray sent her to apologize.

"Q. Was it a white lady or a colored lady?
"A. A colored lady. And I told her I wouldn't accept his apology because he didn't have no right of doing it."

Finally, a court member evinced interest in this aspect of the testimony and sought further information:

"Q. On this apology you were talking about on the 4th of January; was that an apology to you?
"A. And Mrs. S ———.

"Q. To both of you?
"A. Both.

. . . . .

"A. She said she was in the emergency room and saw Airman Murray down there. He sent her up to apologize to us, that he was sorry. He had already sent a message to some nurses and they wouldn't accept it. When the night shift came on one of the nurses came over and said he was sorry for what he had done and we accepted the apology."

Trial counsel successfully sought the introduction of this evidence on the basis of demonstrating the intent of the accused "regarding the alleged act." However, in his final argument, he gave the matter fuller scope:

". . . I need not argue this, gentlemen. Of this there is no doubt. It is with this in mind that I feel that the government has beyond any reasonable doubt met all the elements of the offenses charged and the specifications thereto, as required by law. *There is even testimony in the case as to attempts by Airman Murray to apologize for his acts through other persons. Now, why did he do this?*" [Emphasis supplied.]

And, again, in rebuttal:

". . . On the afternoon of 6 January when attempted apologies were made on the part of the accused were they [the victims] still suffering hallucinations? I think the complaint had been entered and the accused was trying to correct the wrong—but too late."

Regarding the testimony in question, the law officer instructed the members of the court-martial:

"There was adduced some testimony that an apology was tendered on behalf of the accused to Mrs. K ——— and Mrs. S ———. You are advised that you may consider such testimony for the purpose of determining that such a statement was made; however, you may not consider it as proof of the offenses charged."

There is no doubt the testimony by either victim concerning the purported apologies transmitted to █ them by individuals not called as witnesses and subject to cross-examination was inadmissible hearsay. United States v Cotton, 13 USCMA 176, 32 CMR 176; United States v Winters, 13 USCMA 454, 32 CMR 454; United States v Webb, 12 USCMA 276, 30 CMR 276;

United States v Sessions, 10 USCMA 383, 27 CMR 457. Such evidence is incompetent even in absence of objection, although such was in fact made here. As was noted in the *Sessions* case, supra, at page 387:

". . . It is fundamental learning that statements of others not under oath, and not in court subject to cross-examination, are inadmissible when offered to prove the truth thereof. United States v Mounts, 1 USCMA 114, 2 CMR 20; paragraph 139*a*, Manual for Courts-Martial, United States, 1951."

The Government tacitly concedes the alleged apologies by the accused were inadmissible in evidence when offered as a part of the testimony of the recipients as obtained from third parties not produced in court or subject to cross-examination. It urges, however, the error in receiving such hearsay is not prejudicial. First, it contends the action of the court-martial in acquitting accused of one specification and convicting him only of a lesser included offense with relation to the other indicates conclusively that it disregarded the statements. Secondly, it argues the other evidence of accused's guilt is so compelling that no fair risk of using the inadmissible proof exists. We reject both contentions.

Under the state of this record, substantial reasons may have existed for the rejection of the testimony of one of accused's alleged victims and the consequent acquittal of the specification to which it related. Were we to speculate concerning the vagaries which may have affected the minds of the fact finders, there seems to be an ample basis set forth in this record for the court-martial's action. But we need not attempt to fathom the reasoning which led it partially to acquit the accused.

The real essence of the question presented is whether the inadmissible testimony constituted an acknowledgment of guilt by the accused. If so, it was admitted in violation of his substantial rights, and prejudice is inherent. Kotteakos v United States, 328 US 750, 90

L ed 1557, 66 S Ct 1239 (1946); Rule 52, Federal Rules of Criminal Procedure; Krulewitch v United States, 336 US 440, 93 L ed 790, 69 S Ct 716 (1949). See also United States v Williams, 7 USCMA 434, 22 CMR 224; and United States v Yearty, 8 USCMA 191, 23 CMR 415.

The two victims of the alleged indecent assaults both testified that they learned through others that the accused "apologized . . . and said he was sorry for what he had done." They obviously believed that he was conceding his responsibility for the offenses charged. Indeed, one of them initially rejected the apology "because he didn't have no right of doing it," although both later accepted the tendered regrets. Trial counsel apparently drew the same inference for, in his final argument, he declared the apologies removed any doubt of accused's guilt, and contended that, by making such, "the accused was trying to correct the wrong" which he had perpetrated. As our attention is not directed to any other act or event to which accused's apologies might relate, we, too, must view this testimony as a confession of his guilt, inadmissible in evidence because of its hearsay character. Its receipt as a part of the proof constituted reversible error. Krulewitch v United States, supra.

The decision of the board of review is reversed, and the record of trial is return to The Judge Advocate General of the Air Force. A rehearing may be ordered.

Judge KILDAY concurs.

QUINN, Chief Judge (dissenting):

The accused was acquitted of the offense alleged as to Mrs. K. It is unimportant whether this was because the court-martial concluded she might have been mistaken in her assessment of the situation in that she was "sleepy, groggy and drowsy" as the result of medication administered to her, or because her testimony was not corroborated and, therefore, did not meet the standard for conviction in a sex case, as defined in the instructions of the law officer. What is important is,

there were no similar deficiencies in the evidence as to the offense respecting Mrs. S. She positively identified the accused and his actions toward her; and she was fully corroborated by Mrs. K who, at this time, was indisputably in full possession of her faculties. In the face of the evidence, the findings of the court-martial, and the law officer's instruction that no consideration could be given to the evidence as far as it related to the merits, I cannot see how the accused was prejudiced by the references to his "apology." The inference that can drawn from the "apology" is not a confession. As Dean Wigmore has observed, "a confession . . . is a direct assertion of the incriminating fact and does not include within its definition mere conduct used circumstantially." Wigmore, Evidence, 3d ed, § 279 (2). Accordingly, the present case does not, in my opinion, come within the rule dealing with an inadmissible confession, which apparently is relied upon by the majority. See United States v Williams, 7 USCMA 434, 22 CMR 224.

The evidence of guilt is absolutely convincing. I would, therefore, affirm the decision of the board of review.